LAWRENCE S. MIDDLETON (SBN 157866)
Attorney at Law
811 Wilshire Boulevard, 17th Floor
Los Angeles, California 90017
Telephone: (213) 465-2646 (ext. 411)
Facsimile: (310) 388-5671
Email: lawrencemiddleton@lmiddletonlaw.com

Attorney for Plaintiff Kendrick Sampson

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

KENDRICK SAMPSON,

            Plaintiff,

    vs.

THE CITY OF LOS ANGELES, THE LOS
ANGELES POLICE DEPARTMENT, CHIEF
MICHEL MOORE, individually, as a supervisor,
and in his official capacity as Chief of the Los
Angeles Police Department, Officer JERITT
SEVERNS, Officer ALLAN SALAZAR, Officer
OSCAR ARIAS, Officer RUBEN RODRIGUEZ,
Officer DAVID MARTIN, and DOES 1-10
inclusive,

            Defendants.

CASE NO. CV 22-_____

**COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

       Plaintiff Kendrick Sampson, by and through his counsel, Lawrence S. Middleton, Attorney at

Law, files this Complaint against Defendants, the City of Los Angeles, the Los Angeles Police

Department ("LAPD"), the Chief of the Los Angeles Police Department, Michel Moore, LAPD

Officers Jeritt Severns, Allan Salazar, Oscar Arias, Ruben Rodriguez, and David Martin, and Does 1

through 10 inclusive, for violating Mr. Sampson's rights under the First, Fourth, and Fourteenth

Amendments of the United States Constitution.

## **<u>INTRODUCTION</u>**

1.   For more than 30 years LAPD's history of constitutional violations committed against members of the city's communities of color has been symbolized by the March 1991 beating of motorist Rodney King. Captured on video from a nearby apartment balcony and later broadcast around the world, the images of King being beaten by police wielding metal batons as he lay writhing on the ground were viewed with shock and horror "from Paris to Tokyo." The brutal[1] videotaped beating of Rodney King and the subsequent state criminal trial acquittals of the police who beat him sparked outrage, nationwide protests, and ultimately riots in Los Angeles that resulted in the loss of human life and a billion dollars in property damage. One year after the protests and riots the officers who beat King were prosecuted in a federal civil rights trial that ended with the conviction and imprisonment of an officer and a supervisory sergeant. LAPD and the City of Los Angeles were also both named as defendants in a civil lawsuit brought by King that ended in a multi-million-dollar payout to King for the violation of his constitutional rights.

2.   Along with the post-traumatic stress brought on by the Rodney King beating and the riots that followed, came hope for many Black Americans that the video and trials would finally shine a light on the racial injustice seemingly inherent in the policing of minority communities and lead to lasting reform. However, roughly twenty years later nationwide reporting on the killing of Eric Garner at the hands of the New York City police marked the beginning of a seemingly continuous stream of viral news stories of Black people being brutalized and shot and killed by the police. These killings reignited and intensified debate regarding systemic racism in policing and led to protests in various cities across the United States. However, none of those protests would compare to what happened starting in May 2020, when George Floyd, an unarmed Black man, was murdered by the Minneapolis police. Following

---

[1] The level of police brutality against King was such that when the officers later appealed their federal court convictions and sentences, complaining that they would be subject to abuse in prison because of the degree of publicity and condemnation surrounding their crime, United States Supreme Court Justice David Souter noted the officers' reasoning "overlook[ed] the fact that the publicity stemmed from **the remarkable brutality of [their] proven behavior**, which it was their misfortune to have precisely documented on film." *Koon v. United States, 518 U.S. 81, 115-16 (1996)* (Souter J. concurring/dissenting opinion) (emphasis added).

Floyd's death, millions of Americans in cities and small towns across the country took to the streets in protest.

3. On May 27, 2020, and again on May 30, 2020, Plaintiff Kendrick Sampson joined and helped lead the protests in Los Angeles. On May 30, 2020, he was part of a lawful protest that began at Pan Pacific Park. Later the protesters marched to the area of Fairfax Avenue and Third Street, where Mr. Sampson was prepared to bring his day of protesting to an end. However, before he could leave, Mr. Sampson and other protesters were confronted by LAPD officers who, notwithstanding the fact that no formal unlawful assembly had been declared, told them their conduct was illegal and shouted at them to leave the area. Then, when otherwise lawful protesters were slow to respond to the police orders or tried to question why their right to protest guaranteed under the First Amendment of the United States Constitution was being denied, they were poked and prodded with batons, and those who objected, including Mr. Sampson, were beaten with batons and shot at close range by police officers with shotguns and launchers loaded with "non-lethal" projectiles. Even when Mr. Sampson and other protesters attempted to move, using a tactic known as "kettling," the police surrounded the protesters, boxing them in so that they had no place to go.

4. Despite knowing from years of studies, reports, and experience dealing with protests, that these less-lethal weapons often cause serious injury and can even kill,[2] the police nonetheless failed to draw any distinction between the many individuals who were lawfully exercising rights guaranteed to them by the United States constitution and those comparatively few individuals engaging in conduct that might be considered illegal. Instead, the police met any perceived resistance or disobedience to their often conflicting and contradictory orders and commands with a torrent of less-lethal projectiles and baton blows.

5. Mr. Sampson, who was non-threatening and non-violent, was shot multiple times with so-called less-lethal projectiles and beaten with a police baton.

---

[2] James Rainey, <u>Police Say Projectile Launchers are Safer than Other "Less Lethal" Alternatives. Injured Protesters Disagree</u>, Los Angeles Times, (June 12, 2020, 5:00 AM), https://www.latimes.com/california/story/2020-06-12/protesters-complain-about-excessive-force

6.   Mr. Sampson suffered numerous injuries (including to his legs, chest, and face) as the batons and less-lethal projectiles left Mr. Sampson bruised and bleeding. (**See Exhibit 1**).

7.   The LAPD's attack on Mr. Sampson on May 30, 2020, was plainly unconstitutional under the United States Constitution, and Mr. Sampson has suffered grievous harm as a result. Mr. Sampson therefore brings this action to recover for his injuries and to hold the City of Los Angeles, LAPD Chief Moore, LAPD, and the participating officers accountable.

## JURISDICTION AND VENUE

8.   This Court has subject matter jurisdiction over Mr. Sampson's claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C § 1343 (civil rights jurisdiction). Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as the events giving rise to the claims herein occurred in the Central District of California.

9.   Mr. Sampson's claims are all federally/United States Constitution based and therefore the claim presentation provisions of California Code § 910 et seq. do not apply. *Silva v. Crain, 169 F.3d 608, 610 (9th Cir. 1999); Willis v. Reddin, 418 F.2d 702, 704-05 (9th Cir. 1969); Williams v. Horvath, 16 Cal.3d 834, 841-42, 548 P.2d 1125, 1129-1130, 129 Cal.Rptr. 453, 457-58 (1976).*

## PARTIES

10. Plaintiff Kendrick Sampson is a 34-year-old stage actor and filmmaker living in Los Angeles. As a Black man, he has also devoted much of his adult life to promoting the cause of equal justice. Mr. Sampson's activism and the causes he has supported and promoted are well known in Los Angeles both to law enforcement and to city officials.

11. Defendant City of Los Angeles is a municipality operating pursuant to its Charter and organized and incorporated under the laws of the State of California.

12. Defendant LAPD was and is a department and agency of Defendant the City of Los Angeles, acting within its jurisdiction and under its control.

13. Defendant LAPD Chief Michel Moore is, and was at all times relevant to this action, the chief policy maker for LAPD. He is sued in both his individual and official capacities, including as a supervisor and co-conspirator.

14. Defendant Severns was a City of Los Angeles Police Department police officer on May 30, 2020. The acts of this Defendant, which are the subject of this lawsuit, were undertaken under color of law and in the regular course of his employment for the city of Los Angeles Police Department. He is sued in his individual capacity. Upon information and belief, aforesaid Defendant is a resident of Orange County, California.

15. Defendant Salazar was a City of Los Angeles Police Department police officer on May 30, 2020. The acts of this Defendant, which are the subject of this lawsuit, were undertaken under color of law and in the regular course of his employment for the city of Los Angeles Police Department. He is sued in his individual capacity. Upon information and belief, aforesaid Defendant is a resident of the County of Los Angeles.

16. Defendant Arias was a City of Los Angeles Police Department police officer on May 30, 2020. The acts of this Defendant, which are the subject of this lawsuit, were undertaken under color of law and in the regular course of his employment for the city of Los Angeles Police Department. He is sued in his individual capacity. Upon information and belief, aforesaid Defendant is a resident of the County of Los Angeles.

17. Defendant Rodriguez was a City of Los Angeles Police Department police officer on May 30, 2020. The acts of this Defendant, which are the subject of this lawsuit, were undertaken under color of law and in the regular course of his employment for the city of Los Angeles Police Department. He is sued in his individual capacity. Upon information and belief, aforesaid Defendant is a resident of the County of Los Angeles.

18. Defendant Martin was a City of Los Angeles Police Department police officer on May 30, 2020. The acts of this Defendant, which are the subject of this lawsuit, were undertaken under color of law and in the regular course of his employment for the city of Los Angeles Police Department. He is sued in his individual capacity. Upon information and belief, aforesaid Defendant is a resident of the County of Los Angeles.

19. Defendant Does 1 through 10 are agents, servants, and employees of Defendants the City of

Los Angeles and/or LAPD. Mr. Sampson is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10 inclusive, and therefore sues these Defendants by such fictitious names. Mr. Sampson will amend this Complaint to allege their true names and capacities when those identities are ascertained. The individual Doe Defendants are sued in both their individual and official capacities. At all relevant times, Does 1 through 10, in addition to the named Defendants, were and are responsible for the damages and injuries alleged in this Complaint. And at all relevant times, Does 1 through 10 were the agents, servants, and employees of the City of Los Angeles and the LAPD, and were acting at all times within the scope of their agency and employment, under color of state law, and with the knowledge and consent of their principal and employer.

## **FACTUAL ALLEGATIONS**

20. Triggered by the death of George Floyd, an unarmed Black man, who on May 25, 2020 was killed by Minneapolis police officer Eric Chauvin, millions of Americans across the United States took to the streets to lawfully protest racial injustice, police brutality, and systemic racism in policing. Among the leaders of protests organized in the city of Los Angeles was Plaintiff Kendrick Sampson. Mr. Sampson was and is an accomplished stage and screen actor who has starred in popular television series such as the HBO series "Insecure," and the CW Network's "The Flash." But Mr. Sampson is also a committed activist in the promotion of issues of racial justice and liberation. In 2019, Mr. Sampson co-founded BLD PWR ("Build Power"), a charitable organization whose mission is to bring together and leverage the influence of members of the entertainment and sports industries to promote social change, abolish the police, and empower marginalized communities. However, the seeds for Mr. Sampson's life as an activist were sewn many years prior, during his encounters with the police while in high school in Houston, Texas, where like so many young Black teenagers and men, more than once he was the victim of overly aggressive, racially discriminatory policing.

21. It was against this backdrop, and in the context of having watched one unarmed Black man

after another die at the hands of the police that Mr. Sampson made the decision to join and become a leader in the protests sparked by George Floyd's murder.[3]  On May 30, 2020, Mr. Sampson had been leading a group of protesters in a march near the intersection of 3rd and Fairfax, when he was beaten by police who bludgeoned him with batons and shot him at least seven times from point-blank range with "less-lethal" projectiles.

22. The assault on Mr. Sampson came at a time when Mr. Sampson and those around him were protesting lawfully, were unarmed, and presented no threat to the police officers. Indeed, at being confronted by the police the protesters stopped their march and many of them raised their hands in the air. Some of them held signs high over their heads, while others simply raised their hands to the sky, as if in surrender. For his part, like the other protesters Mr. Sampson stopped his forward march. Then, holding a cell phone in each hand, he sought to document the events by video recording them using his cell phone cameras.

23. Nevertheless, LAPD officers agitated and incited the protesters, and by their own reckless and negligent conduct were responsible for the use of force. That conduct included shooting non-violent, non-threatening protesters with less lethal projectiles from point-blank range and striking protesters, including females, so forcefully with baton blows that the blows caused them to fall to the ground.

24. Mr. Sampson, while unarmed and lawfully protesting, was shot at point-blank range with less lethal projectiles, including by Defendant LAPD Officers Oscar Arias and David Martin, and beaten with a baton by Defendant LAPD Officers Allan Salazar and Ruben Rodriguez, among other LAPD officers.

25. In addition to being personally assaulted and injured by the officers, Mr. Sampson witnessed

---

[3]George Floyd's death came after a number of highly publicized deaths, including among others, Michael Brown, Eric Garner, Tamir Rice, Walter Scott, Alton Sterling, and Stephon Clark, not to mention Breonna Taylor, a Black woman who was shot and killed in her own home by police officers looking for a suspect who did not live there and who at the time of the shooting, was already in police custody.  For many who were aware of this long line of tragedy and senseless killing, George Floyd's death marked the final straw.

this provocative behavior against those around him, including against a female protester standing next to him who was bludgeoned to the ground by Defendant LAPD Officer Jeritt Severns. The LAPD officers' aggressive behavior, including violently striking lawful protesters with batons clearly violated LAPD's own use of force policies. Further, the violence against Mr. Sampson and others not only was excessive by constitutional standards, but also served to threaten, intimidate, and impede Mr. Sampson in the free exercise of his constitutional rights, including rights guaranteed to him under the First Amendment of the United States Constitution.

26. Finally, the attack on Mr. Sampson and those he was protesting with came before any formal declaration of an unlawful assembly and without the communication of any dispersal order issued consistent with LAPD policy or standard operating procedure.

I.     **LAPD Has a Long and Well-Documented History of Using Excessive Force, Including Less-Lethal Projectiles to Violate the Rights of Lawful Protesters**

27. That LAPD officers in the field would react to lawful protesters with unreasonable, excessive force, including by beating them with batons and shooting them with less-lethal projectiles, could not have come as a surprise to Chief Moore and LAPD or to the City of Los Angeles. Regardless of any lip-service paid to the notion of reform and the importance of protecting the rights and safety of those seeking to lawfully exercise their constitutional rights to assemble and protest, history reveals a continuing, widespread, and persistent pattern of unconstitutionally excessive force exercised by LAPD against innocent protesters. Notwithstanding any policies and procedures that have been put on paper, at least the unofficial custom and practice has been to use and allow the use of excessive force.

28. During the protests following the beating of Rodney King, foreshadowing the words of Chief Moore 30 years later, rather than recognizing the legitimate grievances that caused protesters to take to the streets, the media, police officials, and politicians portrayed protesters as criminals and gang members without legitimate grievances. "By framing the uprising as one of lawlessness, criminality, and illegality, officials legitimated aggressive policing, mass arrest, and incarceration." *See The 1992 Los Angeles Rebellion: "No Justice, No Peace" (osu.edu).* Rather than engaging in even a pretense that

the police's relationship with communities of color bore any blame for what happened, an after-action report's recommendations focused on "[f]inding new ways to mobilize police power and 'rapid containment.'" *Id.*

29. Since the Rodney King protests, the City of Los Angeles and LAPD's mishandling of protests associated with the Democratic National Convention in 2000, protests in MacArthur Park in 2007, Occupy LA in 2011, and local demonstrations following the death of Michael Brown at the hands of the Ferguson, Missouri Police Department in 2014, have all led to significant monetary settlements. Similar to the instant Complaint, LAPD's alleged constitutionally violative actions in those cases, involved, *inter alia*, the use of less-lethal projectiles, abusing the declaration of unlawful assemblies, kettling, and the misuse of dispersal orders. As a consequence, in the case of the Democratic National Convention, which settled for more than $5,000,000, the court ordered that less lethal munitions may only be used to control persons who are aggressive and/or combative or persons armed with weapons other than firearms or who are destroying property, and that before declaring an unlawful assembly, the incident commander should consider isolating and arresting those responsible for unlawful conduct if feasible. *(See Exhibit 2).*[4]

30. Roughly seven years later, because of allegations of police misconduct during protests in MacArthur Park, the court ordered warnings should generally be given prior to the use of less-lethal munitions. The court further ordered that less-lethal munitions may only be deployed on aggressive and/or combative subjects in a crowd control situation and to prevent the destruction of property and that less lethal munitions are not to be used on lawfully dispersing crowds. The court also again ordered that before declaring an unlawful assembly, the incident commander should consider isolating and

---

[4] Exhibit 2 consists of appendices from "An Independent Examination of the Los Angeles Police Department 2020 Protest Response." These appendices summarize reforms required of LAPD in settlement agreements entered into to resolve prior lawsuits alleging excessive force and other constitutional violations committed against lawful protesters by LAPD.

arresting those responsible for unlawful conduct if feasible, and further that crowds shall be given a reasonable amount of time to disperse before being subjected to arrest. *Id.* The court finally mandated training for Metropolitan Division personnel every year, patrol officers every two years, and command staff every year. Claims stemming from the MacArthur Park protests settled for over $13,000,000. *Id.*

31. In claims brought in 2011 based on Occupy LA, which settled for $2,450,00, plaintiffs alleged they were arrested without being given an opportunity to leave. One of the terms of the settlement was that demonstrators not be kettled while trying to disperse. *Id.*

32. Finally, the settlement in the Ferguson lawsuit provided that demonstrators be given a dispersal order and an opportunity to leave before being arrested and that demonstrators shall not be kettled after the dispersal order is given. *Id.*

33. Since the end of the George Floyd protests in June 2020, multiple separately conducted after-action reviews have concluded LAPD failed to properly train its officers on the use of less-lethal launchers and shotguns and failed to maintain some of the requirements mandated by the settlement agreements in lawsuits filed after prior protests that also included allegations of excessive use of force against lawful protesters. One such report, prepared at the request of the Los Angeles City Council, unequivocally concluded that not all people struck with less-lethal munitions during the May – June 2020 protests were engaging in criminal activity.[5] On the issues of training and supervision, it also found that "the deployment of less lethal munitions was not always done at the direction of a supervisor or officer. In some instances, officers were directed to be in front of a skirmish line and left to deploy less lethal tools, including the 40 mm, with no direction or coordination."[6] That report finally concluded

---

[5] Gerald Chaleff, Report by Independent Counsel: An Independent Examination of the Los Angeles Police Department 20202 Protest Response, (March 10, 2021).

[6] Id.

that personnel certified to deploy the 40 mm less-lethal launcher received only a two-hour block of instruction which was insufficient given the skill level needed to deploy the 40mm in a chaotic public order policing environment.[7]

## II. The City of Los Angeles, LAPD, and Chief Moore were put on Notice of Ongoing Constitutional Violations During the Three Days of Protests Leading Up to May 30

34. In addition to the clear pattern established by LAPD conduct during prior protests, after the protests that occurred on May 27, 28, and 29, the City of Los Angeles and LAPD, including Chief Moore, were aware of complaints by protesters that LAPD officers on the ground were using less-lethal weapons against lawfully demonstrating protesters in clear violation of written LAPD policies and directives. *See James Queally, Kevin Rector, & Richard Winton*, *Troubling videos capture L.A. police violence amid protests - Los Angeles Times (latimes.com)* They were also aware of tactics employed by small groups of instigators and agitators who sought to incite violence by hiding within and behind lawful protesters and hurling projectiles at the police. *See An Independent Examination of the Los Angeles Police Department 2020 Protest Response at 7.*

35. Nevertheless, on May 30, 2020, LAPD still had no plan to isolate and arrest those responsible for unlawful conduct, but instead engaged in tactics that treated those properly exercising their constitutionally protected right to protest just the same as it treated agitators and those engaged in allegedly illegal activity. The City of Los Angeles, Chief Moore, and the Los Angeles Police Department also failed to appreciate and to account for the anti-police message underlying the protests, and how that message would impact officers managing the protests. Finally, rather than implement policies and procedures consistent with prior court orders, LAPD, and Chief Moore, supported by the Mayor and the City of Los Angeles, allowed for the use of unlawful assembly declarations and dispersal orders by field-level officers as a tool to quell lawful, constitutionally protected protests, and to justify the indiscriminate, excessive use of force.

36. At a minimum, the City of Los Angeles and LAPD's failure to take proper action in light of

---

[7] Id.

LAPD's long history of using excessive force against lawful protesters and after having been put on notice by the news media through the reporting of allegations of excessive use of force by police during the three days of protesting prior to May 30, 2020, constitutes a deliberate indifference to the use of excessive force and other constitutional violations.

37. Notwithstanding a subsequent apology, rather than condemn the use of excessive force against lawful protesters, in comments made on June 1, 2020, Chief Moore chose to vilify the protesters, stating: "We didn't have protests last night. We had criminal acts. We didn't have people mourning the death of this man, George Floyd, we had people capitalizing. His death is on their hands, as much as it is those officers." Chief Moore, by his comments and in other ways, not only ratified the excessive use of force by officers in the field, in a very public way, he also labeled all protesters, including Mr. Sampson, as criminals.

### III. Chief Moore, Acting in His Official Capacity as a Policy Maker and Individually (Including as a Supervisor and Co-Conspirator) Violated the Constitutional Rights of Lawful Protesters

38. Pursuant to the City Charter, Chief Moore, as the chief administrative officer of the Los Angeles Police Department is also a non-elected officer of the City of Los Angeles. He is also the Police Department's top law enforcement official. In those capacities, Chief Moore is directly responsible for issuing instructions to the employees of the department, which includes directives related to the use of less lethal force and other use of force final decisions that caused Plaintiff's injuries in this case. As an officer of the City of Los Angeles, and as the City's senior law enforcement officer responsible for some, if not all, final decisions related to the use-of-force, Chief Moore is a use of force policy maker for the City of Los Angeles. And, he and other high-ranking city officials (including the mayor) were undoubtedly aware of LAPD's historical and pervasive misuse of less-lethal projectiles and other tactics, such as kettling and baton strikes, against lawful protesters. Therefore, not only is the decision to use these tactics in May 2020 properly attributable to the City of Los Angeles, the inaction to prevent the constitutional violations is the functional equivalent of a decision – also attributable to the City of Los Angeles.

39. Chief Moore violated the rights of lawful protesters not only as a policy maker, but also, by personally supervising and involving himself in the tactical and operational decisions that caused officers in the field to beat and shoot Mr. Sampson and other lawful protesters. During the May 30, 2020, protests, Chief Moore responded to the scene near Fairfax Avenue and Third Street and directly contributed to the violence against lawful protesters, first by issuing orders to field officers to establish skirmish lines, close-off certain streets, and setup boundaries to restrict the movement of lawful protesters, and then by failing to intervene when excessive force was used against lawful protesters.

40. Chief Moore knew or should have known the tactics being employed at his direction allowed for the use of force against protesters who were acting lawfully and had not committed any crime, and by his presence at the scene and by authorizing those tactics, Chief Moore at least tacitly agreed with those officers to violate the rights of the protesters, including Mr. Sampson. At the same time, the officers knew that shooting and beating unarmed, lawful protesters was an excessive use of force. By supervising, coordinating, and directing the activities of those officers, and by taking no action to prevent or to intervene in the excessive use of force, Chief Moore acted in concert with and conspired with them to violate the rights of lawful protesters to assemble and protest under the First Amendment, to not have unreasonable force used against them by police officers acting under color of law under the Fourth Amendment, and to not be deprived of liberty or be subjected to excessive force without due process of law under the Fourteenth Amendment.

## IV.    Mr. Sampson's Physical, Emotional and Reputational Injuries and Suffering

41. In this case, LAPD's violation of Mr. Sampson's constitutionally protected rights to assemble and protest and to not have unreasonable force used against him by police officers acting under color of law has led to untold physical, mental, and emotional pain, suffering and distress. The injuries and the resulting pain, anxiety, and trauma Mr. Sampson suffered from the police attack left him unable and unavailable to pursue opportunities in his chosen profession, or for a period of time, to work at all. The police violations in this case are also believed to have caused Mr. Sampson reputational and professional damage.

**COUNT I**

**Violation of the Fourth Amendment to the United States Constitution**

**(42 U.S.C. § 1983)**

Against Defendant Moore, Defendant Severns, Defendant Salazar, Defendant Arias, Defendant Rodriguez, Defendant Martin, and Does 1 through 10.

42. Mr. Sampson re-alleges and incorporates by reference the preceding paragraphs of this complaint.

43. Mr. Sampson was unlawfully seized by Defendants for purposes of the Fourth Amendment when, acting under color of State law, Defendants intentionally restricted or terminated his freedom of movement during a lawful protest by using a police tactic known as kettling and by using objectively unreasonable and excessive force against Mr. Sampson that included beating Mr. Sampson with a baton and shooting him with less lethal projectiles.

44. As a direct and proximate result of Defendants' unlawful actions, Mr. Sampson endured injury, pain, and suffering.

**COUNT II**

**Violation of the Fourteenth Amendment to the United States Constitution**

**(42 U.S.C. § 1983)**

Against Defendant Moore, Defendant Severns, Defendant Salazar, Defendant Arias, Defendant Rodriguez, Defendant Martin, and Does 1 through 10.

45. Mr. Sampson re-alleges and incorporates by reference the preceding paragraphs of this complaint.

46. Defendants deprived Mr. Sampson of liberty and subjected him to excessive force without due process of law for purposes of the Fourteenth Amendment when, acting under color of State law, Defendants sought to forcibly disperse a lawfully protesting Mr. Sampson by intentionally using force against him that shocked the conscience and was objectively unreasonable in that it caused substantial injury to Mr. Sampson and was disproportionate to any need to use force.

47. Defendants deprived Mr. Sampson of liberty without due process of law for purposes of the

Fourteenth Amendment when, acting under color of State law, Defendants intentionally kettled Mr. Sampson, thereby terminating and restricting his movement and his constitutionally protected right to assemble and protest.

48. Mr. Sampson had a protected First Amendment liberty interests in the right to assemble, protest, and demonstrate lawfully.

49. Mr. Sampson had a right not to be subjected to excessive force while engaging in expressive First Amendment activity.

50. Defendants' conduct in beating unarmed protesters and shooting them with less lethal projectiles as they lawfully exercised their constitutionally protected right to assemble and protest violated the protesters' right to due process under the Fourteenth Amendment as excessive force that shocks the contemporary conscience. *County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998).* Defendants' conduct also violates Plaintiff's Fourteenth Amendment due process rights as an objectively unreasonable use of force against unarmed, non-violent protesters that caused substantial injury and was disproportionate to the need to use force based on any threat presented by Plaintiff and the surrounding protesters. *See Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015); Edrei v. Maguire, 892 F.3d 525, 535-36 (2d Cir. 2018).*

51. As a direct and proximate result of Defendants' unlawful actions, Mr. Sampson endured injury, pain, and suffering.

## COUNT III

### Conspiracy to Violate Civil Rights

### (42 U.S.C. § 1983)

Against Defendant Moore, Defendant Severns, Defendant Salazar, Defendant Arias, Defendant Rodriguez, Defendant Martin, and Does 1 through 10.

52. Mr. Sampson re-alleges and incorporates by reference the preceding paragraphs of this complaint.

53. Each Defendant, acting in concert with one another and other yet-unknown co-conspirators,

conspired to violate Mr. Sampson's civil rights, including his freedom of speech and right to assemble, his right not to have excessive force used against him, and his right not to be deprived of liberty without due process of law.

54. The Defendants, including Chief Moore, at least tacitly agreed to violate Mr. Sampson's rights and committed overt acts in furtherance of the conspiracy by, among other acts, shooting Mr. Sampson, who was unarmed, non-violent, and lawfully protesting, with less lethal projectiles, by beating him with batons, by using a police tactic against him known as kettling, by establishing skirmish lines, by closing off streets, and by failing to act to prevent the use of excessive force against Mr. Sampson and others that occurred in Defendants' presence or that otherwise became known to Defendants.

55. As a direct and proximate result of Defendants' unlawful actions, Mr. Sampson endured injury, pain, and suffering.

## COUNT IV

### Violation of the First Amendment to the United States Constitution – Freedom of Speech
### (42 U.S.C. § 1983)

Mr. Sampson re-alleges and incorporates by reference the proceeding paragraphs of this complaint.

56. Defendants suppressed and prevented Mr. Sampson's free exercise of rights guaranteed by the First Amendment of the United States Constitution, including the right to lawfully assemble and protest, and retaliated against Mr. Sampson for speaking out against and attempting to document police abuse by shooting Mr. Sampson and other lawful protesters near him with less lethal projectiles and by beating them with batons.

57. Defendants threatened, intimidated, and impeded Mr. Sampson in the free exercise of his rights under the First Amendment not only by excessive force and violence directed at Mr. Sampson, but also by the use of excessive force and violence against those around Mr. Sampson.

58. Defendants acted under color of State law when they deprived Mr. Sampson of his right to

16

assemble, protest, and demonstrate lawfully by shooting him and lawful protesters around him with less-lethal projectiles and beating them with batons.

59. The above-described conduct was a proximate cause of harm to Mr. Sampson.

## COUNT V

### Deprivation of Civil Rights – *Monell* Liability[8]

### (42 U.S.C. § 1983)

Against Defendant City of Los Angeles, Defendant LAPD, Defendant Moore in his Official Capacity, and Does 1 through 10.

60. Mr. Sampson re-alleges and incorporates by reference the preceding paragraphs of this complaint.

61. Mr. Sampson was unlawfully seized by Defendants for purposes of the Fourth Amendment when, acting under color of State law, Defendants intentionally restricted or terminated his freedom of movement during a lawful protest by using a police tactic known as kettling and by using objectively unreasonable and excessive force against Mr. Sampson that included beating Mr. Sampson with a baton and shooting him with less lethal projectiles.

62. Defendants deprived Mr. Sampson of liberty and subjected him to excessive force without due process of law for purposes of the Fourteenth Amendment when, acting under color of State law, Defendants sought to forcibly disperse a lawfully protesting Mr. Sampson by intentionally using force against him that shocks the conscience and was objectively unreasonable in that it caused substantial injury to Mr. Sampson and was disproportionate to any need to use force.

63. Defendants deprived Mr. Sampson of liberty without due process of law for purposes of the Fourteenth Amendment when, acting under color of State law, Defendants intentionally kettled Mr. Sampson, thereby terminating and restricting his movement and his constitutionally protected right to assemble and protest.

64. Defendants, by shooting Mr. Sampson and other lawful protesters around him with less

---

[8] *Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978).*

lethal projectiles and by beating them with batons, violated Mr. Sampson's First Amendment right to lawfully assemble and protest.

65. Defendants promulgated and implemented municipal policies, practices, and customs (including informal customs) that have caused the violations complained of herein, and in the alternative, having actual or constructive notice of the constitutional violations described herein, failed to act, thereby allowing the continuation of such policies or customs, and causing the harm complained of herein.

66. Defendants City of Los Angeles, LAPD, Chief Moore, and other officials of the City of Los Angeles authorized, condoned, allowed and ratified the use of batons and other "less lethal" weapons against protesters and Mr. Sampson, having knowledge of the indiscriminate use of "less lethal" weapons against lawful protesters that had caused injury to lawful protesters both during past protests and during the days of the May 2020 protests leading up to the use of less-lethal force against Mr. Sampson, and failed to effectively train officers or to adopt policies and procedures designed to isolate alleged criminals from lawful protesters and otherwise prevent the constitutional violations.

67. The actions and inactions of Defendants as set forth herein occurred with deliberate indifference to either the recurring constitutional violations elaborated herein, and/or the strong likelihood that constitutional rights would be violated as a result of failing to promulgate and implement, and/or failing to follow policies and directives reasonable likely to prevent the constitutional violations.

68. As a direct and proximate result of Defendants' unlawful acts and omissions, and by Defendant's actions in condoning, encouraging, ratifying, and deliberately ignoring the pattern and practice of constitutional violations described herein, Mr. Sampson endured injury, pain, and suffering.

## DAMAGES

69. As a direct and proximate result of the aforesaid acts, practices, policies, and decisions of The City of Los Angeles, LAPD, Chief Moore, Officer Jeritt Severn, Officer Allan Salazar, Officer Oscar Arias, Officer Ruben Rodriguez, and Officer David Martin, and Does 1 through 10, Plaintiff has suffered great mental, emotional, and physical pain, physical injury, suffering, anguish, fright,

nervousness, anxiety, shock, humiliation, indignity, embarrassment, apprehension, and reputational and professional harm which have caused Plaintiff to sustain damages in a sum to be determined at trial.

70. By reason of the herein described acts and omissions of Defendants, and Does 1-10, Plaintiff was required to retain an attorney to prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

71. WHEREFORE, Plaintiff prays for judgment against Defendant City of Los Angeles, Defendant LAPD, Defendant LAPD Chief Michel Moore, Defendant Jeritt Severns, Defendant Allan Salazar, Defendant Oscar Arias, Defendant Ruben Rodriguez, Defendant David Martin, and Does 1 through 10, and each of them, jointly and severally, as described and limited in the Causes of Action set forth above, as follows:

1. For general compensatory damages according to proof;

2. For special damages according to proof;

3. For exemplary and punitive damages against individual defendants in an amount according to proof;

4. For costs of suit and reasonable attorney's fees permitted pursuant to 42 U.S.C. § 1988; and

5. For such further relief as the court may deem just and equitable.

Respectfully submitted,

DATED: May 17, 2022                    _/s/ LAWRENCE S. MIDDLETON___
                                        Attorney for Plaintiff

                                        LAWRENCE S. MIDDLETON (SBN 157866)
                                        Attorney at Law
                                        811 Wilshire Boulevard, 17th Floor
                                        Los Angeles, California 90017
                                        Telephone: (213) 465-2646 (ext. 411)
                                        Facsimile: (310) 388-5671
                                        Email: lawrencemiddleton@lmiddletonlaw.com

**JURY DEMAND**

Trial by jury of all issues is demanded.

DATED: May 17, 2022                    /s/ LAWRENCE S. MIDDLETON   
                                               Attorney for Plaintiff

                                     LAWRENCE S. MIDDLETON (SBN 157866)
                                     Attorney at Law
                                     811 Wilshire Boulevard, 17th Floor
                                     Los Angeles, California 90017
                                     Telephone: (213) 465-2646 (ext. 411)
                                     Facsimile: (310) 388-5671
                                     Email: lawrencemiddleton@lmiddletonlaw.com